Ramon A. MELENDEZ

v.

**HORIZON CELLULAR TELEPHONE COMPANY.**

Civ. A. No. 93–4520.

United States District Court, E.D. Pennsylvania.

Jan. 13, 1994.

Alan B. Epstein, Jablon, Epstein and Wolf, Philadelphia, PA, for plaintiff.

Richard Martin, Astor, Weiss & Newman, Philadelphia, PA, for defendant.

### MEMORANDUM

DALZELL, District Judge.

Plaintiff Ramon A. Melendez filed this action against his former employer, Horizon Cellular Telephone Company ("Horizon"), alleging that Horizon discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.Cons.Stat.Ann. § 951 *et seq.* He also asserts state law claims for wrongful discharge and breach of contract.

Horizon has filed a motion to dismiss or, in the alternative, for partial summary judgment. After careful consideration of the parties' extensive briefing,[1] we will grant Horizon's motion in part and deny it in part for the following reasons.

*Background*

Melendez states in his complaint that he is a sixty-one year old Puerto Rican-born male who Horizon Cellular Telephone Company hired as a Certified Public Accountant on May 29, 1989.[2] According to Melendez, Horizon promised that when it hired a new Chief Financial Officer, it would then promote Melendez to Controller of the company. In September of 1991, however, Horizon hired a new CFO, yet recruited a native-born white male who was thirty years younger than Melendez to be the company's Controller. It then demoted Melendez to the position of Administration Manager and reduced his salary from $36,000 to $30,000 per year. In contrast, the new Controller was hired at a salary of $42,000 per year.

On September 17, 1991, in response to these events, Melendez filed a charge of discrimination with the Equal Opportunity Em-

---

**1.** Not only did the parties file the standard motion, response and reply, but Melendez also filed a "Reply to the Reply".

**2.** At that time, Horizon was called First Eastern Merchant Banking Group. The name was changed to Horizon Cellular Telephone Company in September of 1990.

ployment Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"), alleging that Horizon had discriminated against him on account of his age and national origin in violation of the ADEA and Title VII.

In early March of 1992, after over two months of negotiations, Melendez and Horizon, each with the assistance of counsel, executed a "Negotiated Settlement Agreement" of the claims addressed in the administrative charge of discrimination. Pursuant to that agreement, Horizon promised:

a. To place [Melendez] into the position of Assistant Controller beginning in February 1992 with the understanding that [Melendez] will first be given 28 days to become familiarized with the Cellular Business.

b. To provide [Melendez] the salary of $36,000 effective February 1, 1992.

c. Allow [Melendez] two (2) months to become proficient in the basic duties and responsibilities of the Assistant Controller with the progress to be reported and reviewed at the completion of the two (2) month period.

d. To provide any and all assistance available to ensure that assets are available and utilized by [Melendez] in the performance of his duties.

e. To agree not to retaliate against [Melendez] with respect to the filing of this instant charge.

f. Consideration will be given to the assignment and amount of salary increase at the completion of the period of observation.

g. To maintain strict confidentiality of the facts of this case and the terms of this settlement.

Negotiated Settlement Agreement ¶ 3. In return for Horizon's "satisfactory fulfillment" of the above promises, Melendez agreed to refrain from filing a lawsuit based on the claims in the EEOC charge. *Id.* ¶ 2.

Apparently in anticipation of the agreement's consummation, Melendez ascended to his new position in February of 1992. Melendez contends, however, that Horizon not only failed to provide him with the agreed upon twenty-eight day familiarization period and two month proficiency period, but also denied him any authority in his new position. In any case, on April 8, 1992, Horizon gave Melendez a negative evaluation of his job performance, and on May 13, 1992, it fired him. In response, Melendez filed a second charge of discrimination with the EEOC and the PHRC in which he alleged that his discharge was in retaliation for his filing of the first charge of discrimination.

On August 20, 1993, Melendez filed the ten count complaint in the instant action.

Counts I and III of the complaint allege that Horizon discriminated against Melendez on account of his national origin, in violation of Title VII and the PHRA, when it (a) failed to promote him, (b) replaced him with a native born white male, (c) demoted him, and (d) terminated his employment. Counts II and IV allege that Horizon also violated Title VII and the PHRA when it breached the Negotiated Settlement Agreement and fired Melendez in retaliation for his filing the first charge of discrimination. In Counts V and VII, Melendez alleges that Horizon violated the ADEA and the PHRA when it discriminated against him on account of his age by (a) hiring a younger person to fill the position of Controller, (b) demoting Melendez, and then (c) firing him. Counts VI and VIII assert that Horizon also violated the ADEA and the PHRA when it harassed and terminated Melendez in retaliation for his filing a charge of age discrimination with the EEOC. Count IX alleges that Horizon wrongfully discharged Melendez with the specific intent to harm him, in violation of Pennsylvania law. Finally, in Count X, Melendez asserts a state law cause of action for breach of contract in which he contends that Horizon failed to provide for him as promised in the Negotiated Settlement Agreement.

*Discussion*

As noted above, Horizon has filed a motion to dismiss or, in the alternative, for partial summary judgment.[3] In that motion, Hori-

---

3. Because we can resolve the issues in Horizon's motion without referring to material outside of the pleadings, we will treat the motion as one to dismiss, not for summary judgment.

zon makes three arguments. First, it contends that the Negotiated Settlement Agreement is a bar to all claims arising out of the subject matter of Melendez's first charge of discrimination because those claims were definitively resolved in the settlement agreement. Second, Horizon argues that Count IX, the wrongful discharge count, should be dismissed because Pennsylvania law[4] does not recognize a cause of action for wrongful discharge with the specific intent to harm, the theory under which Melendez is proceeding. Finally, Horizon contends that if we accept its first two arguments, we should also dismiss Count X, the breach of contract claim, because we will no longer have supplemental jurisdiction over that claim.

 When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we must take all allegations contained in the complaint as true and construe them in a light most favorable to the plaintiff. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989); *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). We may grant a motion to dismiss for failure to state a claim upon which relief can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Frazier v. Southeastern Pa. Transp. Auth.*, 785 F.2d 65, 66 (3d Cir.1986).

We will now address each of Horizon's three arguments in turn.

### A. Settlement Agreement As Bar

In subsections (a), (b) and (c) of Counts I and III, and subsections (a) and (b) of Counts V and VII, Melendez asserts age and national origin discrimination claims arising from the events surrounding his demotion to Horizon's Administration Manager in 1991. Horizon points out that these same claims were the subject of Melendez's first EEOC charge of discrimination and were subsequently re-

solved in the Negotiated Settlement Agreement. Horizon therefore contends that the settlement agreement serves as a bar to Melendez's reassertion of these claims.

Melendez, however, argues that Horizon breached the settlement agreement, rendering it invalid and reviving the claims he had consented to relinquish in the agreement. As we stated above, it is Melendez's position that Horizon's breach occurred when it denied him both the twenty-eight day familiarization period and the two month proficiency period, and refused to give him any authority in his new position as Assistant Controller.[5] Melendez also contends that Horizon "fraudulently induced" him to enter the settlement agreement, rendering the agreement void *ab initio*. Complaint ¶ 26. Specifically, Melendez contends that Horizon's sole purpose in entering the agreement was to halt the EEOC's investigation of Melendez's charges and that Horizon had no intention of upholding the terms of the agreement.

 Federal courts have jurisdiction over the enforcement of Title VII settlement agreements, *EEOC v. Safeway Stores, Inc.*, 714 F.2d 567, 571–573 (5th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984), and "[f]ederal common law governs the enforcement and interpretation of such agreements because the 'rights of the litigants and the operative legal policies derive from a federal source.'" *Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir.1991) (quoting *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981)).

In enforcing these agreements, federal courts give EEOC settlement agreements the same effect as voluntary settlements of general litigation, *Lyles v. Meritor Savings Bank*, 1992 WL 165840 *1–2, 1992 U.S. Dist. LEXIS 8247, 3–4 (E.D.Pa. June 11, 1992) (citing *Spiridigliozzi v. Bethlehem Mines Corp., Cambria Division*, 558 F.Supp. 734, 736 (W.D.Pa.1980)), because

---

4. The parties both cite us to Pennsylvania law, which we agree applies given the Pennsylvania citizenship of both.

5. Melendez alleges that Horizon did not even notify the other staff members that it had given Melendez a new position with more authority.

[t]here is no favored status for EEOC complainants entitling them to unusual liberality in disregarding settlements ... What would amount to waiver, release, or covenant not to sue in any civil litigation is sufficient to produce the same consequences with respect to matters covered by EEOC [settlement agreements].

*Spiridigliozzi*, 558 F.Supp. at 736.

■ As a general rule, an individual who executes a settlement agreement cannot "subsequently seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle". *Wilmes v. United States Postal Service,* 810 F.2d 130, 132 (7th Cir.1987) (quoting *Kirby v. Dole,* 736 F.2d 661, 664 (11th Cir.1984)); *see also Strozier v. General Motors Corp.,* 635 F.2d 424 (5th Cir.1981). If an employer breaches a Title VII settlement agreement, the employee may "undoubtedly ... bring an action for breach of that agreement",[6] *Snider,* 923 F.2d at 1408, but the employee's right to revive the settled claims is much less certain.

Many courts have held that parties who enter into Title VII settlement agreements waive their rights to proceed on the underlying claim. *See, e.g., Pilon v. University of Minnesota,* 710 F.2d 466 (8th Cir.1983); *Sherman v. Standard Rate Data Service Inc.,* 709 F.Supp. 1433 (N.D.Ill.1989); *Vermett v. Hough,* 606 F.Supp. 732, 745 (W.D.Mich.1984). Judge Rovner, then of the Northern District of Illinois (now of the Seventh Circuit), has gone so far as to state that "[e]ven when a party alleges a breach of a voluntary settlement agreement, [he] is precluded from reviving the underlying Title VII claim in federal court." *Sherman,* 709 F.Supp. at 1438 (citing *Vermett,* 606 F.Supp. at 745–746). Judge Rovner also acknowl-

edged, however, that in a case where the settlement agreement was procured by fraud, the underlying claims can be revived. *Sherman,* 709 F.Supp. at 1438; *see also Pilon,* 710 F.2d at 468.

■ While we agree with *Sherman*'s approach in the fraud context, in the alleged breach situation we find a better approach suggested in *Spiridigliozzi.* In that case, the court recommended that when the release of a Title VII claim is contingent upon the other party's performance of the promises made in the agreement (as opposed to being contingent upon a mere promise to perform), the prior claim should not be revived unless the "alleged non-compliance ... relate[s] to a matter sufficiently substantial to justify invalidation of the settlement agreement".[7] *Spiridigliozzi,* 558 F.Supp. at 736 n. 1 (cited with approval in *Vermett,* 606 F.Supp. at 732).

Here, Melendez is asserting a claim for breach of the settlement agreement while simultaneously attempting to revive the claims of discrimination that he agreed to abandon in that agreement. This, as we explained above, he cannot do. We must therefore determine whether he is able to revive his earlier discrimination claims by establishing insubstantial performance or fraud, or if he is confined to pursuing his claims arising from those earlier events on a breach of contract theory.

### i. *Substantial Performance*

As *Spiridigliozzi* explained, one way for Melendez to revive his prior discrimination claim is to establish that the settlement agreement is invalid because Horizon's noncompliance with the settlement agreement was substantial.[8] 558 F.Supp. at 736 n. 1.

---

6. The parties themselves acknowledged the availability of this remedy in the settlement agreement, which states that:

> 6. The parties agree that this Agreement may be specifically enforced in court and may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this Agreement.

Negotiated Settlement Agreement ¶ 6.

7. This rule is the same as that under Pennsylvania law where "[i]f the consideration for the release of the prior claim is performance of the

settlement agreement ..., only substantial performance of the obligor's duties under the agreement will extinguish the prior claim." *Polish American Machinery Corp. v. R.D. & D. Corp.,* 760 F.2d 507, 511 (3d Cir.1985) (cited in *Capek v. Mendelson,* 821 F.Supp. 351, 358–359 (E.D.Pa. 1993)).

8. There is no question in this case that the consideration for Melendez's relinquishment of his earlier discrimination claims was Horizon's performance of the promises in the settlement agreement, and not simply the making of the

Because we find that we could not conclude that Horizon's compliance was insubstantial, even taking all of the allegations in Melendez's complaint as true, Melendez may not take advantage of the *Spiridigliozzi* rule.

■ While we acknowledge that the facts as alleged in Melendez's complaint suggest some failure of consideration, we also note that they do not suggest complete failure, or even substantial failure. Even if Horizon did not live up to its promise to train and support Melendez in his new position, it did promote him to Assistant Controller and increased his salary to $36,000.00 in February of 1992, as it had promised in the settlement agreement. Moreover, as Horizon had promised, the company refrained from evaluating him in his new position until two months after his promotion. We also note that there are no allegations that Horizon failed to keep the facts and terms of the settlement strictly confidential as it had promised in paragraph 3(g) of the agreement.

This compliance with the agreement was not insignificant. Absent the agreement, the company had absolutely no obligation to increase Melendez's salary or delay evaluation of his performance for two months. In fact, it had no obligation to retain Melendez as an employee at all. We therefore find that Horizon substantially performed its obligations under the settlement agreement and that, under the *Spiridigliozzi* substantial performance rule, Melendez may not reinstitute his prior discrimination claims.

ii. *Fraud*

■ The second method by which Melendez could breathe life into his prior discrimination claims is by asserting a valid claim for fraud in the procurement of the contract. As we noted above, Melendez has attempted to state such a claim by alleging in his complaint that Horizon entered the settlement agreement with no intention of upholding its terms. This effort fails to achieve its intended purpose, however, because a party who executes a release allegedly procured by fraud has only two choices of remedies— either disaffirm the release and offer to return the consideration, or affirm the voidable contract and waive the fraud. *Nocito v. Lanuitti*, 402 Pa. 288, 289, 167 A.2d 262, 263 (1961) (cited in *Dempsey v. Assoc. Aviation Underwriters*, 141 F.R.D. 248 (E.D.Pa.), *aff'd* 977 F.2d 567 (3d Cir.1992)).[9]

■ Melendez, while seeking to have the agreement rescinded and the release disaffirmed, has failed to return the consideration that he has already received from Horizon. Admittedly, much of the consideration appears to be unreturnable (*i.e.*, the two months of work and the confidentiality), but Melendez certainly could have repaid the difference between the salary he would have received absent the agreement and the salary he received as a result of the agreement. Because he did not do this, we cannot permit him to proceed with his claim of fraud in the procurement of the contract.

Having concluded that (1) Melendez may not invalidate the contract because Horizon substantially performed its obligations under the Negotiated Settlement Agreement and (2) Melendez's fraud claim is infirm, we find that Melendez's only remedy for Horizon's alleged breach of the settlement agreement is a state law breach of contract action. We will therefore dismiss subsections (a), (b) and (c) of Counts I and III, and subsections (a) and (b) of Counts V and VII, the portions of Melendez's claims that attempt to revive the claims he settled in the agreement.

**B.** *Wrongful Discharge with Specific Intent to Harm*

Horizon's second argument in his motion to dismiss or, in the alternative, for partial

---

promises. *See* Negotiated Settlement Agreement ¶ 2 ("[i]n exchange for the satisfactory fulfillment by [Defendant] of the promises contained in paragraph (3) of this Agreement, Ramon A. Melendez ... agrees not to institute a lawsuit with respect to the above-referenced charge").

**9.** Because there is no federal common, or statutory, law on the issue of whether Melendez may maintain this action without rescinding the agreement and returning the benefits received,

we are to look to state law. *Cf. Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 n. 8 (3d Cir. 1993) (to fashion federal common law, we may look to state law rules "as long as [the] state law is consistent with the policies underlying the federal statute at issue.") (quoting *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir.) (en banc), *cert. denied* 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990)).

summary judgment is that we should dismiss Count IX of Melendez's complaint, his state law claim for wrongful discharge with specific intent to harm, because Pennsylvania no longer recognizes such a cause of action. Although there is significant disagreement in the courts on this point, after a careful analysis of the relevant Pennsylvania cases, we conclude that if the Pennsylvania Supreme Court were to be faced with the issue today, it would definitively conclude that the tort of wrongful discharge with specific intent to harm no longer exists.

██ Under Pennsylvania law, an employer is generally permitted to fire an at-will employee for any reason, without explanation. *Henry v. Pittsburgh & L. E. R. Co.,* 139 Pa. 289, 21 A. 157 (1891); *Hershberger v. Jersey Shore Steel Co.,* 394 Pa.Super. 363, 575 A.2d 944, 946 (1990). In 1974, however, the Pennsylvania Supreme Court decided *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), in which it suggested, although did not explicitly create, two possible exceptions to this general rule, wrongful discharge in violation of public policy and wrongful discharge with the specific intent to harm.

Twelve years later, in *Tourville v. Inter-Ocean Insurance Co.,* 353 Pa.Super. 53, 508 A.2d 1263 (1986), the Superior Court embraced and further defined these two exceptions. Other Superior Court panels followed suit. *See, e.g., Mudd v. Hoffman Homes for Youth, Inc.,* 374 Pa.Super. 522, 543 A.2d 1092, 1096 (1988); *Darlington v. General Electric,* 350 Pa.Super. 183, 504 A.2d 306, 318 (1986); *see also, Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571, 577 (1986).

Then, in 1989, the Pennsylvania Supreme Court in *Clay v. Advanced Computer Applications, Inc.,* 522 Pa. 86, 559 A.2d 917 (1989), declined to recognize an exception to the employment at-will doctrine for wrongful discharge with the specific intent to harm. Instead, the Supreme Court stated that:

It should be noted that, as a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship. *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974). Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy.

559 A.2d at 918; *see also Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346, 348 (1990). Furthermore, in a concurring opinion in *Clay,* Chief Justice Nix expressed his belief that "this Court did not announce a cause of action for wrongful discharge in *Geary....* Indeed, the language in *Geary* clearly states that a cause of action for wrongful discharge in an at-will employment relationship does not exist." 559 A.2d at 923.

Panels of the Superior Court have unsurprisingly found since *Clay* and *Paul* that there is no cause of action for wrongful discharge with the specific intent to harm. *Krajsa v. Keypunch, Inc.,* 424 Pa.Super. 230, 622 A.2d 355, 358 (1993) ("[i]n order to survive a challenge of failure to state a cause of action [for wrongful discharge], the complaint must establish the violation of public policy"); *Rutherfoord v. Presbyterian–University Hosp.,* 417 Pa.Super. 316, 612 A.2d 500, 506 (1992) ("the only exception to the at-will doctrine, absent a genuine contract of employment, is a discharge which impinges matters of public policy"); *Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022, 1026 (1991) ("the *Clay* and *Paul* cases ... clearly hold that the only exception to the employment at-will doctrine is where the discharge violates clear mandates of public policy"). *But see Booth v. McDonnell Truck Services, Inc.,* 401 Pa.Super. 234, 585 A.2d 24, 28 (1991) ("if the termination of an employee violates a clear mandate of public policy, or is done with the specific intent to harm the employee, a cause of action will lie.").[10]

**10.** Interestingly, *Booth* does not cite either *Clay* or *Paul.* This may explain why Judge Tamilia could join Judge Olszewski's opinion in *Booth* and one week later join Judge Montemuro's in *Yetter;* if this may once have evidenced equivocation on Judge Tamilia's part, his joining in Judge Hudock's *Rutherfoord* opinion in 1992 would seem to suggest that he has definitively resolved the ambiguities he harbored in 1991. Since Judge Hester joined in both *Booth* and *Rutherfoord,* we conclude that he, too, has now resolved the issue as Judge Tamilia has.

In light of the foregoing cases, which document the apparent birth of this exception to the employment at-will doctrine and then its demise before adulthood, we find that the Pennsylvania Supreme Court, if faced with this issue again, would definitively hold that Pennsylvania does not recognize the tort of wrongful discharge with specific intent to harm.[11] We will therefore dismiss Count IX of Melendez's complaint.

### C. Jurisdiction

Horizon's third and final argument is that we should dismiss Count X of Melendez's complaint because, having dismissed the claims arising out of the substance of the settlement agreement as well as the wrongful discharge claim, we no longer have jurisdiction over the state law breach of contract claim.

According to Horizon, our jurisdiction over the breach of contract claim is premised on supplemental jurisdiction. As we noted above, however, there is a powerful federal interest in enforcing Title VII settlement agreements and, therefore, under that statute, federal courts have jurisdiction over the interpretation and enforcement of such agreements. *Safeway, supra,* 714 F.2d at 571-573; *Eatmon v. Bristol Steel & Iron Works, Inc.,* 769 F.2d 1503, 1516 (11th Cir. 1985). This is true even when state law governs both the right and the remedy of the contract action. *Eatmon,* 769 F.2d at 1516. We therefore decline to dismiss Melendez's claim of breach of contract because our jurisdiction under 28 U.S.C. § 1331 continues in view of the federal interest in settlements of Title VII claims. In any event, given this strong federal concern, we alternatively elect to exercise our supplemental jurisdiction under 28 U.S.C. § 1367.

*Conclusion*

For the foregoing reasons, we will grant Horizon's motion insofar as it seeks the dismissal of subsections (a), (b) and (c) of Counts I and III, subsections (a) and (b) of Counts V and VII, and Count IX, but we will deny it to the extent that it requests that we dismiss Count X.

---

**11.** Inasmuch as the *Geary* dictum never matured into a formal holding of the Pennsylvania Supreme Court, there was nothing for the Supreme Court to overrule when it decided *Clay.* It is on this point that our analysis differs from that of our colleague, Judge Joyner, in *Altopiedi v. Memorex Telex Corp.,* 834 F.Supp. 800 (E.D.Pa. 1993). We take comfort that we have been faithful to our *Erie* enterprise in the recognition that seven out of eight Superior Court judges who have canvassed the issue since *Clay* and *Paul* have come to the same conclusion we have here. At the time he briefly analysed this problem in *Foley v. Presbyterian Ministers' Fund,* 749 F.Supp. 109, 111 n. 6 (E.D.Pa.1990), Judge Pollak did not have the benefit of these later Superior Court readings of *Geary-Clay-Paul.*